IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

GOLF TAILOR, LLC,

    Plaintiff,

v.

CHUDY GROUP, LLC dba
GOLF GIFTS & GALLERY, INC., and
DEAN CHUDY, an individual,

    Defendants.

Case No. CIV-16-1458-W

## FIRST AMENDED COMPLAINT

Plaintiff, Golf Tailor, LLC ("Golf Tailor"), makes this First Amended Complaint against Defendants, Dean Chudy and Chudy Group, LLC, dba Golf Gifts & Gallery, Inc. ("GG&G").

## INTRODUCTION

1. This is a case for misappropriation of trade secrets and breach of fiduciary duty.

2. Golf Tailor is a designer of innovative golf clubs and other golf-related products. In 2013, Golf Tailor engaged GG&G to manufacture in China certain golf products made from Golf Tailor's designs.

3. Golf Tailor chose GG&G as its Chinese manufacturer based on representations made by GG&G's principal, Dean Chudy. Chudy told Golf Tailor that GG&G had its own manufacturing facilities in China, and that it had the special knowledge and experience necessary to shepherd Golf Taylor's designs from conception to product in

China quickly and inexpensively. Golf Taylor, who did not have this special knowledge about Chinese manufacturing, reasonably relied on these representations, and a relationship of trust was formed.

4. These representations by Dean Chudy were knowingly false and misleading, and intended to induce reliance by Golf Tailor.

5. GG&G was not an independent manufacturer, but was an agent of Kingstar Corporation, a/k/a Dongguan City Huanda Sports Equipment Co. Ltd. ("Kingstar"), a factory in China that itself makes and sells golf clubs and related products. Instead of protecting Golf Tailor's creations, GG&G helped Kingstar and its principal Jonathan Wang to misappropriate Golf Tailor's designs, resulting in Wang's filing for Chinese and U.S. patents on Golf Tailor's designs without Golf Tailor's knowledge or consent. Eventually, Kingstar began using the same molds as it had used to manufacture Golf Tailor's designs to produce counterfeit clubs for its own account, which Kingstar then sold on Amazon and EBay.

6. GG&G owed a duty of care and loyalty to Golf Tailor to protect Golf Tailor's designs and to refrain from helping third party competitors claim ownership of these designs.

7. GG&G also owed a duty to Golf Tailor to disclose its relationship with a potential competitor and misappropriator of trade secrets. GG&G continues to work with Kingstar and others to misappropriate Golf Tailor's intellectual property. Golf Tailor asks this Court for injunctive and declaratory relief to stop GG&G's ongoing harm to Golf Tailor's market for its products, and for damages to compensate for past injuries.

## PARTIES

8.   Golf Tailor is an Oklahoma limited liability company with its principal place of business in Edmond, Oklahoma.

9.   GG&G is an Illinois corporation. On information and belief, GG&G's principal place of business is Genoa City, Wisconsin. Unless context indicates otherwise, all Defendants are referred to as "GG&G" or "Defendants."

10.   On information and belief, Defendant Dean Chudy is an individual residing in Wisconsin. Golf Tailor is informed and believes that Mr. Chudy is a principal and/or supervisory employee of GG&G and that he personally authorized, participated in or directed the acts that led to this complaint. On information and belief, Mr. Chudy had the right and ability to supervise or control the alleged activity, and has a direct financial interest in this activity. In addition to or alternatively, Mr. Chudy knew or should have known of the activity that led to this complaint, and took actions that contributed to the activity.

## JURISDICTION AND VENUE

11.   This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for the federal Defense of Trade Secrets act claims, and supplemental jurisdiction over the state law trade secrets and fiduciary duty claims under 28 U.S.C. § 1367(a). The Court also has diversity jurisdiction under 28 U.S.C. § 1332, because there is complete diversity between plaintiff and all Defendants, and the value of the rights Golf Tailor seeks to have enforced exceeds $75,000.

12. This Court has personal jurisdiction over Defendants because they entered into contracts in this district with Golf Tailor and because Defendants' contacts with this district are sufficient to provide specific personal jurisdiction under the due process clause.

13. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Golf Tailor's claims occurred in this district.

## FACTS

14. Golf Tailor first began working with GG&G in or around 2014. After Golf Tailor principal Tim Oyler designed various golf-training aids, he spoke with Mr. Chudy and GG&G to discuss manufacturing these designs in China on behalf of Golf Tailor.

15. GG&G held itself out as a manufacturer and distributor of golf products, with special expertise and knowledge about manufacturing in China. For example, GG&G's Linked-In page states:

> Golf Gifts and Gallery supplies the golfing community with a wide assortment of accessories (like tees, club covers, divot tools, and training tools) and decor (artwork, desk accessories, display cases, and so on). Headquartered in Powers Lake, Wisconsin, GG&G also has an office in China and supplies many of the country's major sporting goods stores like Golf Galaxy, Dick's Sporting Goods, and Golfsmith.[1]

16. GG&G's representations from Mr. Chudy and others that its special knowledge and expertise in Chinese manufacturing would enable it to turn Golf Tailor's ideas into commercially viable products made in China were a primary reason Golf Tailor chose to work with GG&G.

---

[1] https://www.linkedin.com/company/golf-gifts-&-gallery.

17.  Golf Tailor has never had an office in China.

18.  From 2014 to 2015, Golf Tailor engaged GG&G for multiple projects, including manufacturing golf clubs and other training aids, before working on the projects that are the subject of this lawsuit. During this time, GG&G never informed or suggested to Golf Tailor that Golf Tailor's designs would become GG&G's property, that GG&G might disclose these designs to third parties, or that GG&G might help these third parties file patents in China or the U.S. based on the Golf Tailor designs.

19.  At all times until March 2016, Golf Tailor reasonably expected that GG&G would keep the Golf Tailor product designs as confidential trade secrets until they were commercially released and disclosed to the public. Golf Tailor divulged its trade secret designs to GG&G only for the purpose of having GG&G manufacture these designs to Golf Tailor's specifications in China, disclosing them only to GG&G and others on a need-to-know basis.

20.  Maintaining these trade secrets as confidential before public release was very important to Golf Taylor. In the competitive golf products market, the first product in a particular class to hit the market will have a significant advantage over other similar products that are released later.

21.  Furthermore, Golf Tailor would have never allowed other competitors, including Chinese manufacturers such as Kingstar, to have access to its confidential designs, to make them available for patenting in China or elsewhere, to allow others to make competitive products, or to allow others to file patent lawsuits against Golf Tailor based on Golf Tailor's own designs.

5

22. On or about April 2015, Golf Tailor asked GG&G to manufacture a new golf training aid designed by Mr. Oyler, called the "Speed Whip."

23. Based on Golf Tailor's design, Clint Eagar, an employee of GG&G, prepared the CAD drawings for the Speed Whip.

24. Golf Tailor and GG&G communicated back and forth, with Mr. Oyler making all design modifications to what eventually would become his final Speed Whip design.

25. Per the parties' agreement, Golf Tailor paid GG&G a per-unit price for each completed manufacturing order, and GG&G sent finished Speed Whips to Golf Tailor for quality control inspection and for sale to distributors and consumers.

26. Around July 2014, and concurrently with the manufacture of the Speed Whip, Golf Tailor engaged GG&G to prepare CAD drawings based on Mr. Oyler's design for a new golf club called the "XE1" or "XE1 Wedge." Mr. Oyler's design was intended to enable golfers to make more accurate short shots during a golf game (the "XE1 Clubs").

27. Golf Tailor's and GG&G's process of turning Mr. Oyler's design for the club into CAD drawings and eventually into a prototype and final product was similar to the process the parties had used since the beginning of their relationship. Under the parties' agreement, Golf Tailor paid GG&G a per-unit price for each completed order, and GG&G sent finished clubs from China to Golf Tailor for quality control inspection and for sale to end user consumers.

28. In January 2016, Golf Tailor approved the final samples of the Speed Whip and placed an order with GG&G for 6,000 units.

29. In March 2015, Golf Tailor approved the final samples created by GG&G of the XEI Club and placed an order for 2,700 XE1 wedges.

30. At no time was Golf Tailor informed that GG&G was contracting with a third party manufacturing company in China (Kingstar) to manufacture the Speed Whip and XE1 Clubs. Golf Tailor believed GG&G was manufacturing the Speed Whip and XE1 Clubs in its own facility in China.

31. Until March 2016, Golf Tailor did not know that its confidential information and trade secrets had been disclosed to a third party manufacturing company in China, nor would it ever have approved of such a disclosure.

32. On March 3, 2016, Mr. Chudy informed Golf Tailor that design patent No. 201530414054.8 (the "XE1 Patent") had been approved the previous week by the Chinese patent office. Though the Chinese patent application claimed the very XE1 wedge design created by Mr. Oyler and disclosed to GG&G, the application named Kingstar chief executive Jonathan Wang as the sole inventor of the design on the patent application. This Chinese design patent was later used by Wang as the basis for filing a U.S. patent, which issued as U.S. Patent D766,388. Wang has now sued Golf Tailor for infringement of this U.S. patent in federal court in Texas.

33. Golf Tailor was shocked. Until this disclosure, Golf Tailor had never heard of either Kingstar or Jonathan Wang, nor was Golf Tailor aware that anyone other than Mr. Chudy or Mr. Eagar had received copies of XE1 or Speed Whip confidential design information. Neither Mr. Chudy nor Mr. Eagar had ever disclosed or even suggested that they were working with third parties to file patents on Golf Tailor's designs.

34. Golf Tailor told GG&G that GG&G's disclosure of Golf Tailor's confidential designs to outsiders was completely unacceptable, and it threatened to stop doing business with GG&G. From March 2016 to August 2016, GG&G made numerous efforts to attempt to assuage Golf Tailor, including offering to transfer patent ownership to Golf Tailor.

35. Golf Tailor has since discovered that GG&G also misappropriated the Golf Tailor Speed Whip design by giving the design to Mr. Wang. Mr. Wang used Golf Tailor's Speed Whip design to file for a Chinese design patent. Once the Chinese patent issued, Mr. Wang used it to file an expedited patent application in the U.S., which has now issued as U.S. Patent D769,390 S.

36. Not only did GG&G materially assist Kingstar and Mr. Wang with misappropriating Golf Tailor's designs, but it also abetted Kingstar's making counterfeit Golf Tailor products bearing Golf Taylor's "XE1" trademark, which were sold on Amazon and Ebay.

37. GG&G's associate, Mr. Wang, has now filed two suits accusing Golf Tailor of infringing patents based on Mr. Oyler's designs. *Wang v. Golf Tailor*, Civil Action No. 6:16-cv-1163, U.S. Dist. Ct., E.D. Tx. (XE1 Patent); *Wang v. Golf Tailor*, Civil Action No.: 6:16-cv-1233, E.D. Tx. (Speed Whip Patent). Golf Tailor could never have imagined that its own designs, confidentially disclosed to GG&G for the purpose of commercializing Golf Tailor's products, would become the subject of two separate federal lawsuits against it claiming patent infringement based on bogus patents filed with GG&G's help.

38. Mr. Chudy and GG&G were classic double agents. While pretending to be Golf Taylor's agent for manufacturing Golf Taylor-designed golf products, they were in fact working for their undisclosed principals, Kingstar and Mr. Wang.

39. During the course of GG&G's agency for Kingstar and Mr. Wang, GG&G misappropriated and helped others misappropriate extremely valuable trade secrets that were created by and belonged to Golf Tailor.

40. GG&G's actions constitute violations of federal and state trade secret acts, and state law breach of fiduciary duty. Unless GG&G is subject to an order by this Court restraining it from continuing to work with its Chinese and U.S. principals, Golf Tailor may never regain ownership of its own designs. GG&G should also be held liable for damages due to the lost sales and other harms resulting from GG&G's double-dealing.

## CAUSES OF ACTION

### First Cause of Action
### Federal Defense of Trade Secrets Act, 18 U.S.C. § 1836

41. Golf Tailor incorporates all numbered paragraphs set forth above.

42. Golf Tailor has sold the XE1 Clubs and the Speed Whip in interstate commerce.

43. Golf Tailor's trade secret designs derive independent economic value, actual or potential, from not being generally known to or readily ascertainable through appropriate means by other persons who might obtain economic value from their disclosure or use.

44. Golf Tailor has made reasonable efforts under the circumstances to maintain the secrecy of these trade secret designs.

45. GG&G has misappropriated Golf Tailor's trade secret designs by disclosing them to third parties, including Kingstar and Jonathan Wang, knowing that these third parties would use these trade secrets for their own economic benefit and to GG&G's detriment. GG&G knew that it had no permission to disclose or otherwise use Golf Tailor's trade secret designs other than in Golf Tailor's interests.

46. Among other things, GG&G's misappropriation has led to third parties' manufacture of counterfeit Golf Tailor products and other products that compete with Golf Tailor's products, to Wang's improper filing of patents in the U.S. and China on designs created and owned by Golf Tailor, and to lawsuits against Golf Tailor based on its own intellectual property.

47. GG&G's and the third parties' use and disclosure of the Golf Tailor Trade Secrets has and will irreparably harm Golf Tailor, some of which harm cannot be adequately compensated by remedies at law. The balance of equities favors an equitable remedy, and the public interest would not be disserved by an injunction.

48. To the extent Golf Tailor's harms may be compensated by legal remedies, Golf Tailor is entitled to recover damages from GG&G in an amount to be determined at law.

## Second Cause of Action
### Oklahoma Uniform Trade Secrets Act, 78 O.S. § 85 *et seq.*

49. Golf Tailor incorporates all numbered paragraphs set forth above.

50. Golf Tailor's trade secret designs derive independent economic value, actual or potential, from not being generally known to or readily ascertainable through appropriate means by other persons who might obtain economic value from their disclosure or use.

51. Golf Tailor has made efforts that are reasonable under the circumstances to maintain the secrecy of these trade secret design.

52. GG&G has misappropriated Golf Tailor's trade secret designs by disclosing them to third parties, including Kingstar and Jonathan Wang, knowing that these third parties would use these trade secrets for their own economic benefit and to GG&G's detriment. GG&G knew that it had no permission to disclose or otherwise use Golf Tailor's trade secret designs.

53. Among other things, GG&G's misappropriation has led to third parties' manufacture of counterfeit Golf Tailor products and other products that compete with Golf Tailor's products, to the improper filing of patents in the U.S. and China on designs created and owned by Golf Tailor, and to lawsuits against Golf Tailor based on its own intellectual property.

54. GG&G's and the third party's use and disclosure of the Golf Tailor trade secrets has and will irreparably harm Golf Tailor, some of which harm cannot be adequately compensated by remedies at law. The balance of equities favors an equitable remedy, and the public interest would not be disserved by an injunction.

55. To the extent Golf Tailor's harms may be compensated by legal remedies, Golf Tailor is entitled to recover damages from GG&G in an amount to be determined at law.

### Third Cause of Action
**Breach of Fiduciary Duty, Oklahoma Common Law**

56. Golf Tailor incorporates all numbered paragraphs set forth above.

57. GG&G was an agent hired by Golf Tailor to assist with manufacturing golf equipment based on Golf Tailor's original designs. Golf Tailor entered into a relationship of trust with GG&G, reasonably relying on GG&G's statements that it had its own manufacturing facility in China, and that it would use its superior knowledge of Chinese manufacturing to help Golf Tailor bring its designs to market for the benefit of Golf Tailor.

58. As an agent of Golf Tailor, GG&G owed Golf Tailor fiduciary duties of care and loyalty. GG&G's fiduciary duties include obligations to discharge their actions in good faith and to act in the best interests of Golf Tailor.

59. GG&G breached its fiduciary duties of care and loyalty when it failed to disclose Kingstar as its principal, when it disclosed Golf Tailor Trade Secrets to third parties in order to benefit GG&G and Kingstar while harming Golf Tailor, and when it helped third parties, including Kingstar and Mr. Wang, file intellectual property claims on Golf Tailor's designs.

60. GG&G's breach of its fiduciary duties to Golf Tailor by the use and disclosure of the Golf Tailor trade secrets has and will irreparably harm Golf Tailor, some of which harm cannot be adequately compensated by remedies at law. The balance of

equities favors an equitable remedy, and the public interest would not be disserved by an injunction.

61.  To the extent Golf Tailor's harms may be compensated by legal remedies, Golf Tailor is entitled to recover damages from GG&G in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Golf Tailor requests the following relief:

a. That the Court preliminarily and permanently enjoin GG&G, its officers, agents, servants, employees, investors, shareholders and attorneys from further using, disclosing, or misappropriating the Golf Tailor trade secret designs;

b. That the Court declare this to be an exceptional case;

c. That the Court award to Golf Tailor actual damages under applicable laws;

d. That the Court award to Golf Tailor punitive or exemplary damages on the basis of GG&G's willful, malicious and intentional conduct;

e. That the Court award Golf Tailor costs and disbursements;

f. That the Court award Golf Tailor its reasonable attorneys' fees; and

g. That the Court grant such further and additional relief as this Court may deem just and proper.

DATED this 26th day of January, 2017.

                Respectfully submitted,

                /s/ William K. Elias
                William K. Elias, OBA No. 2667
                John R. Bomhoff, OBA No. 32356
                Elias, Books, Brown & Nelson, P.C.
                211 North Robinson, Suite 1300
                Two Leadership Square
                Oklahoma City, Oklahoma 73102
                Telephone: 405/232-3722
                Facsimile: 405/232-3746
                Email: wkelias@eliasbooks.com
                Email: jbomhoff@eliasbooks.com

                **ATTORNEYS FOR PLAINTIFF**
                **GOLF TAILOR, LLC**